Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard, First Floor
Mineola, NY 11501
Telephone:   516.741.4977
Facsimile:   516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIFFANY SNYDER, <br><br> Plaintiff, <br><br> v. <br><br> NEOGEN CORPORATION, JOHN E. ARDENT, JAMES C. BOREL, RALPH A. RODRIGUEZ, CATHERINE E. WOTECKI, WILLIAM T. BOEHM, RONALD D. GREEN, JAMES P. TOBIN, and DARCI L. VETTER, <br><br> Defendants. | Case No.: <br><br> COMPLAINT FOR: <br><br> (1) Violation of § 14(a) of the Securities Exchange Act of 1934 <br> (2) Violation of § 20(a) of the Securities Exchange Act of 1934 <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, Tiffany Snyder, by and through her attorneys, alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this stockholder action against Neogen Corporation ("Neogen" or the "Company"), Neogen's Board of Directors (the "Board" or the "Individual Defendants," and collectively with Neogen and the Board, the "Defendants"), for violations of Sections 14(a) and

20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of efforts to sell the Company to 3M Company, and to enjoin an upcoming stockholder vote on a proposed stock transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a December 13, 2021 filing with the United States Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, pursuant to which the Company will combine with 3M's food safety business (the "SpinCo Business") in a Reverse Morris Trust transaction. Upon consummation of the transactions contemplated by the Merger Agreement, each share of Common Stock outstanding will automatically be converted into the right to receive a number of shares of common stock, at an exchange ratio calculated such that following the Merger former holders of SpinCo Common Stock will own, in the aggregate, 50.1% of the issued and outstanding Company Common Stock and the existing holders of Company Common Stock will own, in the aggregate, 49.9% of the issued and outstanding Company Common Stock.

3.      Thereafter, on March 18, 2022, Neogen filed a Preliminary Proxy Statement on Form PREM14A attaching the proxy statement (the "Preliminary Proxy Statement") with the SEC in support of the Proposed Transaction.

4.      The Proposed Transaction is unfair for a number of reasons. Significantly, the dubious nature of the stock issuance at the heart of the Proposed Transaction is laid bare considering the extreme dilutive effect that the Proposed Transaction will have on Plaintiff's Company stock.

5.      Furthermore, it appears as though the Board has entered into the Proposed Transaction to procure for itself and senior management of the Company significant and immediate

benefits with no thought to Plaintiff, as well as the Company's public stockholders.

6.      In violation of the Exchange Act, Defendants caused to be filed the materially deficient Preliminary Proxy Statement on March 18, 2022 with the SEC in an effort to Plaintiff, to vote in favor of the Proposed Transaction.  The Preliminary Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in violation of the Exchange Act.  As detailed below, the Preliminary Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Neogen and SpinCo, provided by Neogen and 3M management to the Board and the Board's financial advisor Centerview Partners, LLC ("Centerview") and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by Centerview, if any, and provide to the Company and the Board.

7.      Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages suffered by Plaintiff resulting from the violations of the federal securities laws by Defendants.

## PARTIES

8.      Plaintiff is a citizen of Michigan and, at all times relevant hereto, has been a Neogen shareholder.

7.      Defendant Neogen is a Michigan corporation whose principal executive office is located at 620 Lesher Place, Lansing, MI 48912.  Neogen's common stock is publicly traded on Nasdaq under the symbol "NEOG."

8.      Defendant John E. Ardent ("Ardent") has served as director of Company at all relevant times. In addition, Ardent also serves as the Company's Chief Executive Officer ("CEO") and President.

9.      Defendant James C. Borel ("Borel") has served as director of Company at all relevant times.

10.     Defendant Ralph A. Rodriguez ("Rodriguez") has served as director of Company at all relevant times.

11.     Defendant Catherine E. Wotecki ("Wotecki") has served as director of Company at all relevant times.

12.     Defendant William T. Boehm (Boehm") has served as director of Company at all relevant times.

13.     Defendant Ronald D. Green (Green") has served as director of Company at all relevant times.

14.     Defendant James P. Tobin (Tobin") has served as director of Company at all relevant times.

15.     Defendant Darci L. Vetter ("Vetter") has served as director of Company at all relevant times.

16.     The Defendants named in paragraphs 8-15 are referred to herein as "Individual Defendants" or "Director Defendants."

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive

one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

18.     Personal jurisdiction exists over each defendant either because the defendants conduct business in or maintain operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the NasdaqGS Stock Exchange which is headquartered in this District.

## SUBSTANTIVE ALLEGATIONS

### *Background of Neogen*

20.     Neogen Corporation, together with its subsidiaries, develops, manufactures, and markets various products for food and animal safety worldwide. It operates through two segments, Food Safety and Animal Safety. The Food Safety segment offers diagnostic test kits and related products to detect dangerous and unintended substances in food and animal feed, including foodborne pathogens, spoilage organisms, natural toxins, food allergens, genetic modifications, ruminant by-products, meat speciation, drug residues, pesticide residues, and general sanitation concerns; and AccuPoint Advanced rapid sanitation test for adenosine triphosphate, a chemical found in living cells. This segment offers its products primarily to food and feed processors; grain producers and processors; producers of cookies, crackers, candy, ice cream, and other processed foods; meat and poultry processors, seafood processors, fruit and vegetable producers, and dairies;

laboratories; and producers of pharmaceuticals, cosmetics, veterinary vaccines, and nutraceutical products. The Animal Safety segment provides veterinary instruments, pharmaceuticals, vaccines, topicals, diagnostic products, rodenticides, cleaners, disinfectants, insecticides, and genomics testing services for the animal safety market. This segment offers various products for researchers to detect biologically active substances. Its drug detection immunoassay test kits are used for the detection of abused and therapeutic drugs in farm and racing animals; detection of drug residues in meat and meat products; and human forensic toxicology drug screening applications. In addition, this segment's products are used to maintain sanitary conditions and limit the potential hazards of bacteria, fungi, and viruses. The company sells its products directly, as well as through distributors and retail chains. Neogen Corporation was incorporated in 1981 and is headquartered in Lansing, Michigan.

21.    The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated sustained and solid financial performance. For example, in a September 21, 2021 press release announcing its Fiscal Year 2022 First Quarter Financial Results, the Company highlighted such milestones as revenues of $128,305,000, a 17% increase compared to the previous year's first quarter revenues of $109,325,000. Additionally, the company's Food Safety and Animal Safety segments each recorded double-digit increases in organic sales in the first quarter, representing the third straight quarter of double-digit organic growth at both segments.

22.    Speaking on the positive results, Defendant CEO Ardent commented in the Press Release, "As the world continues to weather the COVID-19 pandemic, our strong results showcase Neogen's resilience and perseverance,"….. "I am pleased that we are reporting growth across almost all of our core product lines. Additionally, our Food Safety sales team has seen tremendous

excitement surrounding our new Megazyme product offerings, which have now been integrated into our product portfolio. This positive start to our new fiscal year makes us optimistic for the remainder of the year."

23.     The financials and optimism are not an anomaly, but rather, are indicative of a trend of continued success and future potential success by Neogen. Clearly, based upon these positive financial results and outlook, the Company is likely to have tremendous future success.

24.     Nevertheless, the Individual Defendants have caused Neogen to enter into the Proposed Transaction.

***The Flawed Sales Process***

25.     As detailed in the Preliminary Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to purchase SpinCo by any means possible.

26.     Notably, the Preliminary Proxy Statement fails to indicate whether an independent committee of independent and disinterested board members was created to run the sales process.

27.     In addition, the Preliminary Proxy Statement is silent as to the nature of any confidentiality agreements entered into between the Company, SpinCo, and/or 3M, whether any such agreements differed from one another or any other agreement with potentially interested third parties not specifically mentioned by the Preliminary Proxy Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

28.     It is not surprising, given this background to the overall sales process, that it was

conducted in an inappropriate and misleading manner.

***The Proposed Transaction***

29.     On December 14, 2021, Neogen and 3M issued a joint press release announcing

the Proposed Transaction.  The press release stated, in relevant part:

> **LANSING, Mich., and ST. PAUL, Minn., December 14, 2021** – NEOGEN
> Corporation (NASDAQ: NEOG) and 3M (NYSE: MMM) announced today that
> they have entered into a definitive agreement pursuant to which 3M will separate
> its Food Safety business and simultaneously combine it with NEOGEN in a
> transaction that is intended to be tax-efficient to 3M and its shareholders for U.S.
> federal income tax purposes. The combination will create an innovative leader in
> the food safety sector with a comprehensive product range and a strategic focus on
> the category's long-term growth opportunities.
>
> The transaction implies an enterprise value for 3M's Food Safety business of
> approximately $5.3 billion, including $1 billion in new debt to be incurred by 3M's
> Food Safety business. This represents an implied multiple of approximately 32x
> and 27x CY 2022E Adjusted EBITDA pre and post run-rate synergies respectively,
> based on NEOGEN's closing price as of December 13, 2021. 3M's Food Safety
> business will fund to 3M consideration valued at approximately $1 billion, subject
> to closing and other adjustments. The combined company is expected to have an
> enterprise value of approximately $9.3 billion, based on NEOGEN's closing share
> price as of December 13, 2021. Under the terms of the definitive agreements, which
> involve a tax-free "Reverse Morris Trust" structure, existing NEOGEN
> shareholders will continue to own approximately 49.9% of the combined company,
> and 3M shareholders will receive approximately 50.1% of the combined company.
> The Boards of Directors of both NEOGEN and 3M have unanimously approved the
> transaction.
>
> "This combination will enhance NEOGEN's position in this new era of food
> security, equipping us with an expanded product line that enables us to capitalize
> on our growing footprint, reaching more customers, more often, while continuing
> our track record of strong and consistent growth," said John Adent, NEOGEN's
> President and Chief Executive Officer. "The heightened global focus on food
> security, sustainability and supply chain solutions around the world presents
> exciting opportunities for NEOGEN to be positioned as an innovative leader at the
> forefront of the growth and digitization of the industry. We're excited to welcome
> 3M's Food Safety employees to the NEOGEN team, and we're looking forward to
> demonstrating the immense benefits of this combination to our customers,
> employees and shareholders."

"NEOGEN and 3M share a deep commitment to quality, innovation and customer satisfaction and long histories of industry leadership. By combining our Food Safety business with NEOGEN, we will create an organization well positioned to capture long-term profitable growth. This transaction further evolves our strategy, focuses our health care business and benefits our stakeholders, as we actively manage our portfolio to drive growth and deliver shareholder value," said Mike Roman, 3M Chairman and Chief Executive Officer.

### *An Innovative Global Leader in Food Safety: Key Strategic Benefits*

The combination is expected to generate significant long-term value for shareholders of the combined company, as well as customers and employees by:

- Creating a leading innovator in an industry benefiting from growing demand: NEOGEN's pure play food security business, combined with the long-term tailwinds of increased global focus on sustainability, food safety and supply chain solutions, mean NEOGEN is the ideal home for 3M's Food Safety business. A combination will create a global innovator in food safety with the geographic footprint, product range and innovation capabilities to further capitalize on attractive and enduring growth trends.
- Expanding food safety product offerings to better serve customers: The company will have a significantly expanded product offering in food safety, particularly in indicator testing and pathogen detection areas, which complement NEOGEN's existing microbiology lines. NEOGEN will also be able to offer 3M food safety customers its genomics services, which deliver innovative DNA testing – a new offering to 3M food safety customers. This expanded product range, along with NEOGEN's complementary animal safety business, increases the solutions with which NEOGEN helps customers protect the world's food supply from the farm gate to the dinner plate.
- Generating global growth opportunities: The combined company creates an opportunity to optimize NEOGEN and 3M Food Safety's high-growth capabilities to add value for customers through a compelling product offering. Beyond the U.S. and Europe, heightened interest in developing nations in improving food safety presents significant growth potential for the combined company. The combination will also provide investment flexibility to pursue international expansion.
- Creating a compelling offering through enhanced R&D capabilities, innovation and analytics: NEOGEN is looking to the future of the industry, and with 3M's Food Safety business, will possess the breadth and digital capabilities to lead the digitization of the food security industry. The complementary product offerings combined with NEOGEN's data-driven analytics approach will create a compelling solution as customers seek innovative partners to increase efficiency and enhance food safety protocols.

- Enhancing revenue, margin and earnings stability: The combined company is expected to have an improved financial profile, which is expected to further enhance NEOGEN's already consistently high-performing revenue stream with improved EBITDA margins by increasing exposure to highly profitable food safety categories and providing substantial run-rate growth and cost synergies of approximately $30 million in EBITDA contribution. These synergies are expected to be achieved by the end of year three following the close of transaction through efficiencies in product innovation, sales, marketing, distribution and production. The combination will boost NEOGEN's food safety segment to approximately 70% of total revenue post-transaction, with total projected pro forma revenues of approximately $1 billion expected in the first full year post closing. Pro forma EBITDA is expected to be approximately $300 million with a higher overall EBITDA margin profile of approximately 30% expected in the first full year post closing.

### Transaction Details

The transaction involves a tax-free "Reverse Morris Trust" transaction structure, where 3M's Food Safety business will be spun-off or split-off to 3M shareholders and simultaneously merged with a wholly owned subsidiary of NEOGEN. The transaction is intended to be tax-efficient to 3M and 3M's shareholders for U.S. federal income tax purposes. At the completion of the transaction, NEOGEN will issue a number of shares to 3M shareholders such that 3M shareholders will receive approximately 50.1% of the combined company and existing NEOGEN shareholders will continue to own approximately 49.9% of the combined company. In connection with the transaction, 3M will also receive consideration valued at approximately $1 billion, subject to closing and other adjustments.

NEOGEN's expected pro forma net leverage ratio at close is expected to be less than 2.5x, inclusive of the $1 billion of new debt. Strong expected free cash flow generation and EBITDA growth of the combined business enables rapid deleveraging post-closing.

### The Materially Misleading and/or Incomplete Preliminary Proxy Statement

30.     On March 18, 2021, the Neogen Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy Statement that, in violation the Exchange Act, failed to provide Plaintiff in her capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up*
*to the Proposed Transaction*

31.     Specifically, the Preliminary Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy Statement fails to disclose:

      a.    Adequate reasoning as to why the Board agreed to a transaction in which the public stockholders of the Company, including Plaintiff, would receive nothing other than to have their shares diluted in value;

      b.    Specific information as to why no committee of independent and disinterested board members was created to run the sales process;

      c.    Whether any confidentiality agreements entered into by the Company with Neogen on the one hand and SpinCo and/or 3M on the other differed from any other unnamed confidentiality agreement entered into between the Company and potentially interested third parties if any, and if so, in what way; and

      d.    All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and any potentially interested third parties throughout the sales process, including SpinCo and/or 3M, would fall away.

*Omissions and/or Material Misrepresentations Concerning Neogen and SpinCo Financial*
*Projections*

32.     The Preliminary Proxy Statement fails to provide material information concerning financial projections for Neogen and SpinCo provided to and relied upon by Centerview in its

analyses. The Preliminary Proxy Statement discloses financial projections for the Company which are materially misleading.

33.     The Preliminary Proxy Statement should have, but fails to provide, certain information in the projections for Neogen and SpinCo that were provided to the Board and Centerview. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

34.     With respect to *Neogen Standalone Forecast Projections* provided, the Preliminary Proxy Statement fails to disclose material line items for the following metrics:

     a.  EBITDA, including all underlying metrics, inputs, and assumptions, including specifically: interest, taxes, depreciation and amortization, including stock-based compensation expense;

     b.  Unlevered Net Income, including all underlying metrics, inputs, and assumptions, including specifically: depreciation and amortization, and cash tax expense; and

     c.  Unlevered Net Income, including all underlying metrics, inputs, and assumptions, including specifically: net operating profit after taxes (including the specific sub-metrics depreciation and amortization and cash tax expense), capital expenditures, increases in net working capital and acquisition spend.

35.     With respect to *Neogen Reforecasted Food Safety Projections* provided, the Preliminary Proxy Statement fails to disclose material line items for the following metrics

a. EBITDA, including all underlying metrics, inputs, and assumptions, including specifically: interest, taxes, depreciation and amortization, including stock-based compensation expense;

b. Unlevered Net Income, including all underlying metrics, inputs, and assumptions, including specifically: depreciation and amortization, and cash tax expense; and

c. Unlevered Net Income, including all underlying metrics, inputs, and assumptions, including specifically: net operating profit after taxes (including the specific sub-metrics depreciation and amortization and cash tax expense), capital expenditures, increases in net working capital and certain estimates of one-time expenditures related to operational and facility transitions.

36. With respect to *3M Food Safety Business Projections* provided, the Preliminary Proxy Statement fails to disclose material line items for the following metrics:

a. Adjusted Gross Profit, including all underlying metrics, inputs, and assumptions, including specifically: cost of goods sold, and the specific adjustments made for stock-based compensation, parent expense allocations that would not apply to a standalone entity, and items of a non-recurring and/or non-operational nature; and

b. Adjusted EBITDA, including all underlying metrics, inputs, and assumptions, including specifically: earnings before interest expense, income taxes, depreciation and amortization, and the specific adjustments made for stock-based compensation, parent expense allocations that would not apply to a standalone entity, and items of a non-recurring and/or non-operational nature.

37.     This information is necessary to provide Plaintiff in her capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

38.     Without accurate projection data presented in the Preliminary Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the true worth of SpinCo (and therefore the true worth of the Company post-close), the accuracy of Centerview's financial analyses or make an informed decision whether to vote in favor of the Proposed Transaction.  As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Centerview*

39.     In the Preliminary Proxy Statement, Centerview describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

40.     With respect to the *Selected Public Comparable Companies Analysis*, the Preliminary Proxy Statement fails to disclose the following:

     a.   The specific inputs and assumptions used to determine the utilized reference range of 2022E EV/EBITDA multiples of 32.5x to 37.5x.

41.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy Statement fails to disclose the following:

a.  The terminal value of Neogen calculated;

b.  The terminal value of SpinCo calculated;

c.  The specific inputs and assumptions used to determine the applied range of exit multiples of 32.5x to 37.5x to the terminal year projected EBITDA projections of each Neogen and SpinCo;

d.  The specific inputs and assumptions used to determine the utilized discount rate range of 8.0% to 9.0% as applied to Neogen and SpinCo;

e.  Neogen's weighted average cost of capital utilized;

f.  SpinCo's weighted average cost of capital utilized; and

g.  The "certain metrics" utilized for each of Neogen and SpinCo, including specifically for each, the "capital structure, the cost of long-term U.S. Treasury debt, tax rates, historical and projected unlevered and levered betas for certain selected comparable companies, as well as certain financial metrics for the U.S. financial markets generally".

42.     These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

43.     Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes her value and serves her interest as a stockholder.  Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in her best interests as a public Neogen stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Preliminary Proxy Statement.

**FIRST COUNT**

**Violations of Section 14(a) of the Exchange Act**

**(Against All Defendants)**

44.     Plaintiff repeats all previous allegations as if set forth in full herein

45.     Defendants have disseminated the Information Statement in favor of the Proposed

Transaction.

46.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection

with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means
> or instrumentality of interstate commerce or of any facility of a national
> securities exchange or otherwise, in contravention of such rules and
> regulations as the [SEC] may prescribe as necessary or appropriate in the
> public interest or for the protection of investors, to solicit or to permit the
> use of her name to solicit any proxy or consent or authorization in respect
> of any security (other than an exempted security) registered pursuant to
> section 78l of this title.

47.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any
> proxy statement, form of proxy, notice of meeting or other communication,
> written or oral, containing any statement which, at the time and in the light
> of the circumstances under which it is made, is false or misleading with
> respect to any material fact, or which omits to state any material fact
> necessary in order to make the statements therein not false or misleading or

necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

48.     The Information Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Information Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

49.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

50.     The Individual Defendants were at least negligent in filing an Information Statement that was materially misleading and/or omitted material facts necessary to make the Information Statement not misleading.

51.     The misrepresentations and omissions in the Information Statement are material to Plaintiff and the Class, and at present fail to provide complete information if such misrepresentations and omissions are not corrected.

**SECOND COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against All Defendants)**

52.     Plaintiff repeats all previous allegations as if set forth in full herein.

53.     The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and

Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Information Statement was materially misleading to Company stockholders.

54.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Information Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Information Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Information Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

55.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Neogen's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Information Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Information Statement and are therefore responsible and liable for the misrepresentations contained herein.

56.     The Individual Defendants acted as controlling persons of Neogen within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the

Individual Defendants had the power and authority to cause Neogen to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Neogen and all of its employees. As alleged above, Neogen is a primary violator of Section 14 of the Exchange Act and SEC Rule Information Statement. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act

WHEREFORE, Plaintiff demands injunctive relief, in her favor, and against the Defendants, as follows:

A.     Enjoining the Proposed Transaction;

B.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.     Directing the Individual Defendants to comply with the Exchange Act to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: March 25, 2022                    **BRODSKY & SMITH**

By: _____
Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone: (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*